IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| FREDERICK JAMES MUSTOE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:13cv354 (JRS) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Frederick James Mustoe ("Plaintiff") is 40 years old and previously worked as a truck driver. On January 6, 2010, Plaintiff applied for Social Security Disability Benefits ("DIB") stemming from degenerative disc disease with an alleged onset date of September 25, 2008. The claim was denied both initially and upon reconsideration. Plaintiff appeared before an Administrative Law Judge ("ALJ") on March 9, 2010, and his claim was again denied. The Appeals Council denied Plaintiff's request for review on April 2, 2013, rendering the ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ incorrectly determined Plaintiff's residual functioning capacity ("RFC"), erred in assessing Plaintiff's credibility and failed to afford Plaintiff's treating physicians' opinions controlling weight. The parties have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties' submissions and the

entire record[1] in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I.    BACKGROUND

Because Plaintiff alleges that the ALJ erred in concluding that Plaintiff could perform limited light work, incorrectly determined Plaintiff's credibility and failed to afford Plaintiff's treating physicians' opinions controlling weight, Plaintiff's work history, Plaintiff's medical history, Plaintiff's testimony and third-party testimony are summarized below.

### A. Education and Work History

Plaintiff was 37 years old when he applied for DIB and he completed school through the ninth grade. (R. at 148, 424.) He testified that he could not read or write, but could write his name and some other small words. (R. at 424.) Plaintiff could calculate basic addition equations, but could not subtract. (R. at 424.)

Plaintiff previously worked as a concrete mix truck driver and dump truck driver. (R. at 427-29.) Plaintiff earned his commercial driver's licenses and last renewed it on July 25, 2008. (R. at 428-29.)

---

[1]    The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

B. Medical Records

1. Dr. Seiler

On September 26, 2006, Plaintiff sought treatment from Sigmund Seiler, M.D., after Plaintiff fell at work the day before. (R. at 402.) Plaintiff complained of constant back pain and numbness in his left thigh. (R. at 402.) He suffered decreased range of motion and flexion with mild effusion and tenderness. (R. at 402.) Dr. Seiler prescribed Flexoril, Darvocet and a Medrol Dose Pack for Plaintiff. (R. at 402.) Plaintiff attended a follow-up appointment on September 28, 2006, indicating that the treatment did not help. (R. at 400.) Dr. Seiler ordered Plaintiff to continue the medication. (R. at 400.) Plaintiff saw Dr. Seiler on October 2, 2006, complaining of increased pain and Dr. Seiler prescribed Vicodin. (R. at 400.)

On October 4, 2006, Dr. Seiler took an x-ray of Plaintiff's spine, which revealed that Plaintiff suffered a compression fracture and suffered multilevel degenerative disc disease. (R. at 69.) On October 10, 2006, Dr. Seiler indicated that Plaintiff suffered increased pain and recommended that Plaintiff perform only light work and lift no more than 25 pounds. (R. at 399.) Dr. Seiler prescribed physical therapy. (R. at 399.) On October 12, 2006, Dr. Seiler noted that Plaintiff required an MRI, but needed more physical therapy sessions before undergoing the procedure. (R. at 399.) Plaintiff returned to Dr. Seiler on October 20, 2006, complaining of numbness and significant pain, especially while bending and lifting, and indicated that physical therapy did not help. (R. at 398.)

Dr. Seiler ordered an MRI of Plaintiff's spine on October 23, 2006. (R. at 398.) Plaintiff received the MRI on October 31, 2006, which revealed that Plaintiff suffered degenerative disc disease and had a small central disc protrusion. (R. at 73.) On November 2, 2006, Plaintiff followed-up with Dr. Seiler and complained that his back pain extended to his leg. (R. at 397.)

3

Dr. Seiler ordered that Plaintiff continue with his medications. (R. at 397.) On December 15, 2006, Plaintiff complained of back pain and abdomen pain, and Dr. Seiler prescribed Plaintiff Vicodin. (R. at 395.) Plaintiff returned to Dr. Seiler on January 15, 2007, with continued complaints of back pain. (R. at 396.) On February 16, 2007, Plaintiff suffered back pain and experienced numbness down his entire leg when walking or standing. (R. at 396.)

On March 21, 2007, Dr. Seiler completed a function report and opined that Plaintiff could sit, stand and walk for one hour at a time, but could not do any of these things during an eight-hour work day. (R. at 65.) Plaintiff could rarely lift less than ten pounds and could never lift more than ten pounds. (R. at 65.) Plaintiff had no difficulty using his hands and fingers, and Dr. Seiler offered no opinion regarding Plaintiff's ability to reach with his arms. (R. at 65.) Plaintiff's condition affected his ability to sleep. (R. at 65.)

During a telephone call on April 3, 3007, Dr. Seiler recommended that Plaintiff decrease his sugar intake to control his weight. (R. at 393.) Dr. Seiler prescribed Trazadone for Plaintiff on July 27, 2007. (R. at 393.) On September 4, 2007, Dr. Seiler noted that Plaintiff's back remained about the same and that Plaintiff would like to avoid surgery if possible. (R. at 393.) Dr. Seiler recommended that Plaintiff continue the same treatment. (R. at 394.) Plaintiff's blood pressure reading remained high on September 10, 2007. (R. at 394.) During Plaintiff's January 14, 2008 appointment, Plaintiff complained of back pain and Dr. Seiler prescribed Vicodin. (R. at 391.) On February 4, 2008, Dr. Seiler indicated that Plaintiff complained of back pain, but the Lidoderm patches helped Plaintiff's condition. (R. at 391.) Dr. Seiler prescribed Keflex on February 11, 2008, and April 9, 2008, and Lidoderm patches on August 15, 2008. (R. at 391.)

Plaintiff returned to Dr. Seiler on September 19, 2008, for a follow-up appointment for Plaintiff's back injury. (R. at 392.) Dr. Seiler prescribed Lyrica for Plaintiff. (R. at 392.) On

4

October 7, 2008, Dr. Seiler prescribed Metoprolol and on October 16, 2008, he prescribed Opana. (R. at 392.) During Plaintiff's November 17, 2008 appointment, Dr. Seiler indicated that Plaintiff could not drive, but was "doing well." (R. at 389.) On December 9, 2008, Plaintiff complained of extreme back pain that rendered him unable to walk or move; therefore, Dr. Seiler recommended that Plaintiff visit the emergency room. (R. at 389.) Dr. Seiler refilled Plaintiff's prescriptions. (R. at 398.) X-rays revealed that Plaintiff had degenerative disc disease, but showed normal alignment and no evidence of fracture. (R. at 299.)

On January 14, 2009, Dr. Seiler noted that Plaintiff fell while climbing the steps and suffered chronic back pain, but things remained overall stable. (R. at 390.) Plaintiff still experienced problems sleeping, but indicated that he slept better than before. (R. at 390.) Dr. Seiler continued to refill Plaintiff's prescriptions. (R. at 388, 390.) Plaintiff attended a follow-up appointment on March 18, 2009, during which Dr. Seiler wrote that Plaintiff was "doing well" and "trying to stay active." (R. at 388.) Dr. Seiler indicated that Plaintiff experienced difficulty sleeping due to the pain in his legs, but could perform his activities of daily living. (R. at 387.) During Plaintiff's September 14, 2009 appointment, Dr. Seiler noted that Plaintiff was "not able to move." (R. at 386.) Dr. Seiler continued to refill Plaintiff's pain and blood pressure medications. (R. at 385-86.)

On April 15, 2010, Dr. Seiler completed mental and physical RFC evaluations. (R. at 329-39.) Dr. Seiler opined that Plaintiff experienced marked limitations in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 330-31.) Plaintiff had no significant limitation in his

5

ability to: (1) remember locations and work-like procedures, (2) understand and remember very short, simple and detailed instructions, (3) carry out very short, simple and detailed instructions, (4) maintain attention and concentration for extended periods, (5) sustain an ordinary routine without special supervision, (6) work in coordination with or proximity to others without being distracted by them, (7) make simple work-related decisions, (8) interact appropriately with the general public, (9) ask simple questions or request assistance, (10) accept instructions and respond appropriately to criticism from supervisors, (11) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (12) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, (13) be aware of normal hazards and take appropriate precautions, and (14) travel in unfamiliar places or use public transportation. (R. at 330-31.)  Dr. Seiler noted that he had no opinion regarding Plaintiff's ability to respond appropriately to changes in the work setting, as he had no knowledge or objective basis for making a decision. (R. at 331.)

Regarding Plaintiff's physical RFC, Dr. Seiler opined that Plaintiff could not lift/carry, sit, push and pull. (R. at 339.)  Plaintiff could stand and/or walk less than two hours in an eight-hour work day. (R. at 339.)  He could not climb, balance, stoop, kneel, crouch or crawl. (R. at 338.)  Plaintiff experienced no manipulative, visual, communication and environmental limitations. (R. at 332-33.)  However, Dr. Seiler opined that Plaintiff must avoid exposure to hot and cold environments. (R. at 333.)  Dr. Seiler refilled Plaintiff's medications and on June 17, 2010, during a telephone call, Plaintiff complained of right leg pain. (R. at 384.)  On August 26, 2010, Plaintiff experienced right shoulder pain, vomiting, stomach pain and numbness. (R. at 384.)

6

2.  Dr. Fiore

Plaintiff sought treatment from Steven Fiore, M.D., on January 12, 2007, for his back pain relating to a work injury. (R. at 252.) Plaintiff complained of pain, numbness and tingling in his back. (R. at 252.) He walked with an altered gait and experienced pain on palpation that radiated from his ribs to his back. (R. at 252.) While physical therapy and pain medication did not alleviate Plaintiff's pain, he experienced relief by laying down flat. (R. at 252.) X-rays revealed a possible fracture in Plaintiff's spine, but because Dr. Fiore could not determine that this caused Plaintiff's pain, he ordered a bone scan. (R. at 253.)

Plaintiff's bone scan revealed no evidence of fracture or abnormality, but showed some mild degenerative changes. (R. at 249.) Plaintiff returned to Dr. Fiore's office on February 14, 2007, complaining of back pain and swelling in his hands and legs. (R. at 248.) Dr. Fiore could not attribute the swelling to Plaintiff's back injury and recommended that Plaintiff use injections to treat the back pain. (R. at 248.)

On December 12, 2007, Dr. Fiore noted that Plaintiff's condition appeared worse and that treatment had not helped. (R. at 290.) He indicated that Plaintiff's pain could possibly be attributed to Plaintiff's small central disc at L4 and L5, but required a discogram to evaluate further. (R. at 290.) Plaintiff underwent discography on January 14, 2008, which revealed a midline disc protrusion, but no rupture, disc herniation or spinal stenosis. (R. at 286.)

Plaintiff saw Dr. Fiore on January 30, 2008, who indicated that while Plaintiff had degenerative discs, he experienced no pain at the spot of the degenerative discs. (R. at 284.) Plaintiff experienced the most pain at L5-S1, which "was his best-looking disc." (R. at 284.) Dr. Fiore opined that Plaintiff could return to work performing sedentary or light duty and should attend physical therapy and use injections. (R. at 284.) On April 30, 2008, Plaintiff returned to

Dr. Fiore with increased pain. (R. at 281.) Physical therapy also caused increased pain. (R. at 281.) Because Plaintiff was not responding to treatment and the surgery option was not available, Dr. Fiore ordered a Functional Capacity Evaluation to determine the level of work that Plaintiff could perform. (R. 281.)

On July 2, 2008, Plaintiff underwent a Functional Capacity Evaluation at Tidewater Physical Therapy. (R. at 57.) During the evaluation, Plaintiff demonstrated the ability to frequently stand and sit and occasionally climb stairs, crawl, squat, kneel, stoop, bend forward and crouch. (R. at 59.) He suffered no limitation in his ability to reach and could occasionally lift, carry and pull a maximum of 31 pounds. (R. at 59.) Plaintiff could occasionally push a maximum of 58 pounds. (R. at 59.) Overall, Plaintiff was capable of performing medium light duty work. (R. at 59.) Dr. Fiore confirmed this opinion. (R. at 271.)

Plaintiff returned to Dr. Fiore on July 29, 2009, and the doctor indicated that Plaintiff continued to suffer from back pain. (R. at 269.) Dr. Fiore determined that Plaintiff should seek a second opinion, because he did not know of any other treatment for Plaintiff. (R. at 269.) Though Dr. Fiore opined that Plaintiff may suffer some disease in his lower thoracic, no evidence presented during the appointment. (R. at 269.) Dr. Fiore noted that, during Plaintiff's previous appointment, Plaintiff could perform light to medium work and used only a moderate amount of pain medication, but upon Plaintiff returning to Dr. Seiler's care, Plaintiff's pain medicine requirement increased and activity ability decreased. (R. at 269.)

C. Non-treating State Agency Opinions

Plaintiff failed to attend his consultative examination with the state agency physician scheduled for April 27, 2010. (R. at 340.) Though the office sent Plaintiff reminders, Plaintiff also missed his consultative examination set for June 4, 2010. (R. at 343, 354-57.)

8

D. Function Reports

On March 8, 2010, Erica D. Guy completed a Function Report for Plaintiff in which Plaintiff indicated that he lived at home with his family. (R. at 189.) Plaintiff described that his day included showering when needed, eating, sitting and standing to watch television, spending time with his daughter and trying to help when possible. (R. at 189.) Plaintiff's mother and Virginia Daniels helped Plaintiff. (R. at 190.) Plaintiff's condition affected his ability to work on the job, at home and in the yard. (R. at 190.) He experienced broken sleep patterns because of his condition. (R. at 190.)

Plaintiff's condition required that he receive help to put on his shirts, that he only took showers to avoid falling and that he did not fix his hair. (R. at 190.) However, his condition had no effect on his ability to shave, feed himself and use the toilet. (R. at 190.) He needed no reminders to tend to his personal needs, but required reminders about the time to take his medications. (R. at 191.) Plaintiff could prepare his own meals, which included making sandwiches, cereal and "quick, easy foods." (R. at 191.) He prepared meals on a weekly basis for about 5-10 minutes each time. (R. at 191.) Plaintiff no longer grilled outside, because he could not stand. (R. at 191.)

Plaintiff indicated that he could not perform any household chores or yard work. (R. at 191.) While Plaintiff did not need to do housework because he had help, Plaintiff's back and shoulder pain precluded him from doing so. (R. at 192.) However, Plaintiff tried to help with housework and yard work when he could. (R. at 192.) Plaintiff went outside about two or three times each week. (R. at 192.) When he went out, he would either drive or ride in a car. (R .at 192.) Plaintiff could go out alone. (R. at 192.) Plaintiff indicated that he did not shop, but could

go into a store for about 5-10 minutes to pick up a couple of items. (R. at 192.) He could count change, but could not pay bills, handle a checking account or use a checkbook, because he could not read. (R. at 192.) His condition did not affect his ability to handle his finances. (R. at 193.)

Plaintiff listed his hobbies as watching television, working on cars, driving a truck, grilling and playing with his child. (R. at 193.) However, Plaintiff noted that he rarely participated in his hobbies anymore. (R. at 193.) He had difficulty sitting to watch long television shows, working and fixing cars, driving and playing with his child. (R. at 193.) Plaintiff spent time with others by having dinner with his immediate family. (R. at 193.) He regularly went to the pharmacy and the doctor's office. (R. at 193.) However, he needed reminders to go places and required someone to assist him. (R. at 193.)

Plaintiff had difficulty getting along with others, because he experienced irritability. (R. at 194.) However, he was never fired from a job due to problems getting along with others. (R. at 194.) Plaintiff indicated that he did not handle stress and changes in his routine well. (R. at 194.) Finally, he noted that his condition caused him extreme anger and irritability. (R. at 194.)

On March 9, 2010, Plaintiff completed a Pain Questionnaire in which he reported that he suffered pain in his arm and lower back. (R. at 178.) Plaintiff described the pain as aching, stabbing, burning and throbbing. (R. at 178.) The pain moved through Plaintiff's back to his legs, arms and shoulders. (R. at 178.) He estimated that he experienced the pain throughout most of the day, every day. (R. at 178.) Bending, standing for long periods of time, sitting, walking long distances and most activities and movements increased Plaintiff's pain. (R. at 178-79.)

Plaintiff indicated that the pain limited his activities since September 26, 2006. (R. at 179.) Pain management and pain medication alleviated the pain. (R. at 179.) Plaintiff used

10

Lidoderm patches for pain three times each day and took Vicodin, Piroxicam, Lyrica, Opana, Gabapentin, Flexoril and Valium daily. (R. at 179-80.) However, the medication caused irritability and drowsiness. (R. at 179.)

### E.  Plaintiff's Testimony

On March 8, 2012, Plaintiff appeared, represented by counsel, at a hearing in front of an ALJ. (R. at 418.) The ALJ asked Plaintiff why he missed examinations by consultative experts scheduled by the state agency. (R. at 424-25.) Plaintiff indicated that he lacked the funds to attend and did not have transportation to the appointments. (R. at 425.) Plaintiff stated that he did not understand that the state agency would have covered the costs of the examinations. (R. at 425.) Further, he could not read and had difficulty understanding things. (R. at 425.) Plaintiff's assistant, Virginia Daniels, and Plaintiff's lawyer submitted Plaintiff's documents to allow Plaintiff to pursue his claims for benefits. (R. at 425.)

Plaintiff had a valid driver's license, but did have to read to take his driving test, so someone read it to him. (R. at 425-26.) However, Plaintiff did not drive due to his diabetes and pain. (R. at 426.) Plaintiff lived with his wife, Mrs. Daniels and his kids. (R. at 426.) Plaintiff had two children — an eight-year-old daughter and an eighteen-month-old son. (R. at 434.) Plaintiff last worked in 2006 and had collected worker's compensation after a work injury, but no longer received it. (R. at 426-27.)

Plaintiff testified that he suffered a back injury in 2006, which caused Plaintiff extreme pain on most days even with medication. (R. at 429.) He experienced few days in which the pain was tolerable. (R. at 429.) Because of the pain, he could not sleep and could "hardly walk." (R. at 429-30.) Plaintiff spent his day sitting on the couch as long as possible and rarely left his home. (R. at 430.) Plaintiff estimated that he could sit about 15-20 minutes before needing to

adjust his position and stand for about 15 minutes. (R. at 430.) He could walk 60 feet and lift about ten pounds without "suffering," but about 30 pounds in "an emergency situation." (R. at 430-31.)

Plaintiff had no surgical options to alleviate the pain. (R. at 431.) He attended pain management and used various pain medications. (R. at 431-32.) His morphine prescription caused him to be shaky, jittery and light headed and the other medications caused drowsiness. (R. at 432.) Plaintiff could only sleep about 15 to 20 minutes at a time, because he tossed and turned and he had to sleep in a chair in his living room. (R. at 432.) During the hearing, Plaintiff's hand shook and swelled, which Plaintiff attributed to his diabetes. (R. at 433.) Plaintiff had no difficulty moving his legs, but experienced numbness on his left side. (R. at 438.)

Plaintiff had difficulty reading and indicated that Mrs. Daniels read Plaintiff's mail to him. (R. at 434.) While driving, Plaintiff could not read street signs. (R. at 440.) Mrs. Daniels had moved in with Plaintiff and his family to help care for Plaintiff while Plaintiff's wife worked. (R. at 434.) Mrs. Daniels helped Plaintiff put on his shoes, socks and jeans, cooked for Plaintiff, laundered Plaintiff's clothes and cared for Plaintiff's children. (R. at 434.) Mrs. Daniels balanced Plaintiff's checkbook and paid his bills. (R. at 436.)

Plaintiff could not play with his kids or pick them up since he suffered his back injury. (R. at 438-39.) He could not care for them due to his medications and their side effects. (R. at 434-35.) Plaintiff had few friends and did not participate in social activities. (R. at 439.) He became "extremely agitated" and snapped at people. (R. at 439.) Plaintiff did not drink or do drugs. (R. at 441.)

12

F.  Third-party testimony

Virginia Daniels testified at the hearing on March 8, 2012, and indicated that she knew

Plaintiff before he suffered an injury at work. (R. at 443-44.) Before his injury, Plaintiff could

do everything. (R. at 444.) After the injury, Mrs. Daniel moved in with Plaintiff and his family

to help Plaintiff. (R. at 444.) Mrs. Daniels helped Plaintiff get dressed, put on his shoes, wash

his hair, cook, and do Plaintiff's laundry. (R. at 444.) She also helped care for Plaintiff's

children and tended to Plaintiff's finances, doctors and social security claim. (R. at 444.)

Plaintiff required help with his finances, because he could not concentrate due to his medication,

read or write. (R. at 445-46.) She did not allow Plaintiff to have access to significant funds. (R.

at 446.)

Regarding Plaintiff's missed consultative examination appointments, Mrs. Daniels

indicated that she tried to explain to Plaintiff that he had to attend. (R. at 445.) She believed that

Plaintiff understood the importance of the appointments, but indicated that they did not have

dependable transportation at the time of the appointments. (R. at 445.) Mrs. Daniels explained

that Plaintiff watched television "off and on" throughout the day and that Plaintiff did not go to

the store. (R. at 446.) Plaintiff's pain caused him to experience mood swings. (R. at 449.)

G.  Vocational Expert Testimony

During the hearing, a VE testified that Plaintiff's work as a concrete mixing truck driver

was semi-skilled work that required medium exertion and Plaintiff's hauling job was unskilled

work that required medium exertion. (R. at 453.) The VE testified that an individual who could

perform light work with limited postural activities, including climbing ramps, stairs, ladders,

ropes or scaffolds, balancing, stooping, kneeling and crawling, could not perform the work that

Plaintiff previously did. (R. at 453.) However, the VE indicated that such a person could

13

perform jobs that existed in the economy. (R. at 454.) These jobs included working as a knife cleaner with 865,000 positions in the national economy and 229,000 positions in Virginia, an assembler with 220,000 positions in the national economy and 6,5000 positions in Virginia, and a laundry folder with 390,000 positions in the national economy and 8,000 in Virginia. (R. at 454-55.) These jobs do not require literacy. (R. at 455-56.)

## II.    PROCEDURAL HISTORY

On January 6, 2010, Plaintiff filed an application for DIB, claiming disability due to degenerative disc disease with an alleged onset date of September 25, 2008. (R. at 13, 15.) The claim was initially denied on January 6, 2010, and again on reconsideration on November 23, 2010. (R. at 13.) Plaintiff filed a written request for a hearing on July 18, 2011, and the ALJ held a hearing on March 8, 2012. (R. at 13.) On March 9, 2012, the ALJ denied Plaintiff benefits, concluding that he was not disabled under the Act, because, based on his age, education and work experience, Plaintiff could perform work that existed in that national economy. (R. at 20-21.) The Appeals Council denied Plaintiff's request for review on April 2, 2013, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 4-6.)

## III.    QUESTION PRESENTED

1. Did the ALJ err in assessing Plaintiff's credibility?

2. Did substantial evidence support the ALJ's decision to afford less than controlling weight to Plaintiff's treating physicians' opinions?

3. Did substantial evidence support the ALJ's determination that Plaintiff maintained the RFC to perform limited light work?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether the Commissioner's decision was supported by substantial evidence on the

record and whether the proper legal standards were applied in evaluating the evidence. *Hancock*

*v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance and is the

kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion.

*Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

To determine whether substantial evidence exists, the Court is required to examine the record as

a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472

(quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on

the record as a whole, the Court must "'take into account whatever in the record fairly detracts

from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings

as to any fact — if the findings are supported by substantial evidence — are conclusive and must

be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*,

667 F.3d at 477 (citation omitted). If the ALJ's determination is not supported by substantial

evidence on the record or if the ALJ has made an error of law, the Court must reverse the

decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine

if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d

171, 177 (4th Cir. 2000). The analysis is conducted for the Commissioner by the ALJ and it is

that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[2] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is

---

[2]     SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

required to determine whether the claimant can return to his past relevant work[3] based on an assessment of the claimant's RFC[4] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock,* 667 F.3d at 472-73; *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146, n.5). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir.

---

[3]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[4]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.,* 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

17

1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V.     ANALYSIS

### A. The ALJ's Decision

The ALJ held a hearing on March 8, 2012, during which Plaintiff, Plaintiff's third-party care-taker and a VE testified. (R. at 416-64.) On March 9, 2012, the ALJ rendered his decision in a written opinion and determined that, based upon the application for DIB filed on January 6, 2010, Plaintiff was not disabled under the Act. (R. at 13-21.)

The ALJ followed the five-step sequential evaluation process as established by the Social Security Act in analyzing whether Plaintiff was disabled. (R. at 14-15); *see also* 20 C.F.R. § 404.1520(a). First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during Plaintiff's onset date of September 25, 2008, through Plaintiff's date last insured of December 31, 2010. (R. at 15.) At step two, the ALJ determined that Plaintiff suffered severe impairment of a spine disorder in the form of degenerative disc disease. (R. at 15.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. (R. at 16.)

The ALJ further found that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 16.) Plaintiff could never climb ladders, ropes and scaffolds. (R. at 16.) In reaching this conclusion, the ALJ considered objective

medical evidence and opinion evidence. (R. at 16.) The ALJ followed a two-step analysis of whether the medically determinable physical symptoms could reasonably be expected to produce Plaintiff's pain and symptoms, and if so, the extent to which the symptoms limit Plaintiff's functioning. (R. at 16-18.) The ALJ concluded that, based on the evidence, while Plaintiff suffered impairments, Plaintiff's testimony and statements describing the durations, frequency, intensity and other information as to symptoms were inconsistent with the objective evidence. (R. at 18-19.) The ALJ also noted that, while Plaintiff failed to attend his consultative examinations due to transportation, Plaintiff attended other doctor appointments. (R. at 18.) Further, the ALJ assigned moderate weight to Dr. Fiore's opinion, because it was inconsistent with Plaintiff's RFC, and little weight to Dr. Seiler's opinion, because it lacked objectivity and support in the record. (R. at 19.)

The ALJ found that Plaintiff could not perform his past relevant work. (R. at 19.) The ALJ also noted that Plaintiff had limited education, but could communicate in English. (R. at 19.) Finally, at step five of the analysis, based upon VE testimony and considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform work that existed in significant numbers in the national economy. (R. at 20.) Therefore, Plaintiff was not disabled under the Act. (R. at 20-21.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ incorrectly assessed Plaintiff's credibility, failed to afford Plaintiff's treating physicians' opinions controlling weight and erred in determining Plaintiff's RFC. (Pl.'s Mot. for Summ. J. or in the Alternative, Mot. to Remand ("Pl.'s Mem.") at 22-27.)

19

B. The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that substantial evidence fails to support the ALJ's determination regarding Plaintiff's credibility, because Plaintiff's missed consultative evaluation appointments and medical evidence corroborates Plaintiff's complaints, rather than discredits them. (Pl.'s Mem. at 23-25.) Defendant maintains that substantial evidence supports the ALJ's determination. (Def.'s Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 11) at 13-17.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of the relevant evidence in the case record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for

the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs.*, Inc., 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *See Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

The ALJ concluded that based on the evidence, while Plaintiff suffered impairments, Plaintiff's testimony and statements describing the durations, frequency, intensity and other information as to symptoms were inconsistent with the objective evidence. (R. at 18-19.) The ALJ also noted that, while Plaintiff failed to attend his consultative examinations due to transportation, Plaintiff attended other doctor appointments. (R. at 18.) The ALJ applied the correct legal standard when assessing Plaintiff's credibility and substantial evidence supports the ALJ's determination regarding Plaintiff's credibility.

Substantial evidence supports the ALJ's credibility assessment on the basis that Plaintiff's complaints were inconsistent with the objective medical record. Though Plaintiff complained of constant pain (R. at 402), on November 17, 2008, Dr. Seiler indicated that Plaintiff was "doing well." (R. at 389.) On January 14, 2009, Dr. Seiler noted things remained overall stable and Plaintiff slept better than before. (R. at 390.) During a March 18, 2009 appointment, Dr. Seiler wrote that Plaintiff was "doing well, "trying to stay active" and performing his activities of daily living. (R. at 388.) In examining the objective medical evidence, Dr. Fiore determined that while Plaintiff had degenerative discs, those discs caused no pain, but his best discs caused the most pain. (R. at 284.) No evidence existed of a disease in Plaintiff's lower thoracic. (R. at 269.)

Plaintiff's own activities of daily living support the ALJ's determination. Plaintiff's condition had no effect on his ability to shave, feed himself and use the toilet. (R. at 190.) Plaintiff could prepare his own meals. (R. at 191.) He prepared meals on a weekly basis and tried to help with housework and yard work when he could. (R. at 191-92.) He could walk 60 feet and lift about ten pounds without "suffering" and about 30 pounds in "an emergency situation." (R. at 430-31.) Plaintiff had no difficulty moving his legs. (R. at 438.)

Further, substantial evidence supports the ALJ's credibility assessment on the basis that Plaintiff failed to attend the consultative examination due to transportation issues. Plaintiff failed to attend his consultative examination with the state agency physician scheduled for April 27, 2010. (R. at 340.) Though the office sent Plaintiff reminders, Plaintiff also missed his consultative examination scheduled on June 4, 2010. (R. at 343, 354-57.) Plaintiff and Mrs. Daniels attributed Plaintiff's missed appointments to lack of understanding and availability of reliable transportation. (R. at 424-25, 444-45.) However, Plaintiff attended multiple

appointments with Drs. Fiore and Seiler. (R. at 69, 248-49, 250-53, 269, 271, 281, 284, 290,

385-402.) Plaintiff indicated that he regularly went to the pharmacy and the doctor's office. (R.

at 193.) Therefore, substantial evidence supports the ALJ's assessment of Plaintiff's credibility.

C. Substantial evidence supports the ALJ's determination to afford Plaintiff's treating physicians' opinions less than controlling weight.

Plaintiff argues that the ALJ's determination to afford Plaintiff's treating physicians',

Drs. Fiore and Seiler, opinions less than controlling weight lacks the support of substantial

evidence, because the objective medical evidence confirms their opinions. (Pl.'s Mem. at 27-

29.) Defendant maintains that substantial evidence supports the ALJ's decision. (Def.'s Mem. at

17-19.)

During the sequential analysis, when the ALJ determines whether the claimant has a

medically-determinable severe impairment, or combination of impairments which would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluation that have been ordered.

*See* 20 C.F.R. § 416.912(f).  When the record contains a number of different medical opinions,

including those from the Plaintiff's treating physician(s), consultative examiners or other sources

that are consistent with each other, then the ALJ makes a determination based on that evidence.

*See* 20 C.F.R. § 416.927(c)(2).  If, however, the medical opinions are inconsistent internally with

each other, or other evidence, the ALJ must evaluate the opinions and assign them respective

weight to properly analyze the evidence involved.  20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be

given controlling weight if it is well-supported by medically-acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record.

23

*Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p.  However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported.  20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

The ALJ is required to consider the following when evaluating a treating physician's opinions: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors.  20 C.F.R. § 404.1527(d)(2)-(6).  However, those same regulations specifically vest the ALJ — not the treating physicians — with authority to determine whether a claimant is disabled as that term is defined by statute.  20 C.F.R. § 404.1527(e)(1).

Here, during Plaintiff's Functional Capacity Evaluation, Plaintiff demonstrated the ability to frequently stand and sit and occasionally climb stairs, crawl, squat, kneel, stoop, bend forward and crouch.  (R. at 59.)  He suffered no limitation in his ability to reach and could occasionally lift, carry and pull a maximum of 31 pounds.  (R. at 59.)  Plaintiff could occasionally push a maximum of 58 pounds.  (R. at 59.)  Overall, Plaintiff was capable of performing medium light duty work.  (R. at 59.)  Dr. Fiore adopted this opinion.  (R. at 271.)  On March 21, 2007, Dr. Seiler opined that Plaintiff could sit, stand and walk for one hour at a time, but could not do any of these things during an eight-hour work day.  (R. at 65.)  Plaintiff could rarely lift less than ten pounds and could never lift more than ten pounds.  (R. at 65.)  Plaintiff had no difficulty using his hands and fingers.  (R. at 65.)  On April 15, 2010, Dr. Seiler opined that Plaintiff could not

24

lift/carry, sit, push and pull. (R. at 339.) Plaintiff could stand and/or walk less than two hours in an eight-hour work day. (R. at 339.) He could not climb, balance, stoop, kneel, crouch or crawl. (R. at 338.) Plaintiff experienced no manipulative, visual, communication and environmental limitations. (R. at 332-33.) However, Dr. Seiler opined that Plaintiff must avoid exposure to hot and cold environments. (R. at 333.) The ALJ assigned moderate weight to Dr. Fiore's opinion, because it was inconsistent with Plaintiff's RCF, and little weight to Dr. Seiler's opinion, because it lacked objectivity and support in the record. (R. at 19.) The ALJ considered Plaintiff's objective medical records, including Plaintiff's MRI's and x-rays in making these determinations.

Substantial evidence supports the ALJ's determination to assign moderate weight to Dr. Fiore's opinion on the basis that it was inconsistent with Plaintiff's RFC. Plaintiff's own activities of daily living support the ALJ's determination. Plaintiff's condition had no effect on his ability to shave, feed himself and use the toilet. (R. at 190.) Plaintiff could prepare his own meals. (R. at 191.) He tried to help with housework and yard work when he could. (R. at 191-92.) He could walk 60 feet, could lift about ten pounds without "suffering," but about 30 pounds in "an emergency situation" and had no difficulty moving his legs. (R. at 430-31, 438.) Plaintiff could go out alone and he would either drive or ride in a car. (R. at 192.) He could also go into a store to pick up a couple of items. (R. at 192.)

Substantial evidence also supports the ALJ's decision to afford little weight to Dr. Seiler's opinion on the basis that it is inconsistent with the medical records and lacked objectivity. Plaintiff's bone scan showed no evidence of fracture or abnormality and Plaintiff's discography showed no rupture, disc herniation or spinal stenosis. (R. at 249, 286.) Plaintiff experienced no pain in his degenerative discs, but Plaintiff experienced the most pain in "his

25

best-looking disc." (R. at 284.) Though Dr. Fiore noted that Plaintiff may have had some disease in his lower thoracic, no evidence existed. (R. at 269.) Plaintiff's x-rays revealed degenerative disc disease, normal alignment and no evidence of fracture. (R. at 299.) Dr. Seiler himself indicated that he had no knowledge or objective basis for making some determinations on Plaintiff's RFC. (R. at 331.) Consequently, the ALJ's evaluation the opinions of Plaintiff's treating physicians was well-supported by the record.

D. Substantial evidence supports the ALJ's determination that Plaintiff maintained the ability to perform limited light work.

Plaintiff argues that the ALJ did not provide a complete description of Plaintiff's RCF. (Pl.'s Mem. at 22-23.) Further, Plaintiff contends that the ALJ failed to include Plaintiff's limitations regarding illiteracy and drowsiness in Plaintiff's RFC. (Pl.'s Mem. at 26-27.) Defendant maintains that substantial evidence supports the ALJ's determination that Plaintiff could perform light work subject to limitations. (Def.'s Mem. at 11-12.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ will first assess the nature and extent of the claimant's physical limitations, and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in making his RFC determination; however, before a determination is made that a claimant is not disabled, the ALJ is responsible for developing the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

After considering all of Plaintiff's physical and mental impairments, the ALJ determined that Plaintiff maintained the RFC to perform light work except that he is limited to occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling. (R. at 16.) Plaintiff could never climb ladders, ropes and scaffolds. (R. at 16.) Therefore, the ALJ provided a complete, fully enunciated RFC. While the ALJ did not find that Plaintiff experienced limitations with regards to his illiteracy and drowsiness, the ALJ considered these conditions when formulating Plaintiff's RFC. (R. at 17.)

Performing light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Further, light work "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

Substantial evidence in the record supports the ALJ's determination that Plaintiff could perform light work. Plaintiff's condition had no effect on his ability to shave, feed himself and use the toilet. (R. at 190.) Plaintiff could prepare his own meals. (R. at 191.) He prepared meals on a weekly basis and tried to help with housework and yard work when he could. (R. at 191-92.) He could walk 60 feet and lift about ten pounds without "suffering" and about 30 pounds in "an emergency situation." (R. at 430-31.) Plaintiff had no difficulty moving his legs. (R. at 438.) Plaintiff could go out alone and he would either drive or ride in a car. (R. at 192.) He could go into a store to pick up a couple of items. (R. at 192.)

Plaintiff's Functional Capacity Evaluation demonstrated that Plaintiff could frequently stand and sit and occasionally climb stairs, crawl, squat, kneel, stoop, bend forward and crouch. (R. at 59.) He suffered no limitation in his ability to reach and could occasionally lift, carry and pull a maximum of 31 pounds. (R. at 59.) Plaintiff could occasionally push a maximum of 58

27

pounds. (R. at 59.) Therefore, substantial evidence supports the ALJ's determination that Plaintiff could perform limited light work.

### IV. Conclusion

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: January 7, 2014

28